**13**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Ian J. Quinn #342754
265 E. River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 490-0949
E-Mail: rwalter@wjhattorneys.com
         iquinn@wjhattorneys.com

Attorneys for Debtor and Debtor in Possession, Kewel K. Munger, dba Munger Investments

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re:<br><br>KEWEL K. MUNGER dba MUNGER INVESTMENTS,<br><br>    Debtor in Possession. | Case No. 24-12709<br><br>Chapter 11<br><br>DC No.: CAE-1 |

| | | |
|---|---|---|
| SSN#: | xxx-xx-8195 | |
| Address: | 2907 Oakley Street | |
| | Bakersfield, CA 93311 | |

| | |
|---|---|
| Date: | November 7, 2024 |
| Time: | 10:30 A.M. |
| Place: | 510 19th Street |
| | Bakersfield, CA |
| Judge: | Honorable Jennifer E. Niemann |

### DECLARATION OF KEWEL K. MUNGER IN SUPPORT OF DEBTOR'S FIRST STATUS CONFERENCE STATEMENT

I, Kewel K. Munger, hereby declare as follows:

1.     I, Kewel (Kable) Munger, am the debtor in this individual Chapter 11 bankruptcy case. I am over the age of eighteen. Except as otherwise indicated all statements in this Declaration are based on my personal knowledge and my review of relevant business documents and information prepared by me or my staff at my request and direction; and, if called as a witness, I would so testify.

2.     I am a farmer, agribusinessman and entrepreneur. I reside in Bakersfield, California, in Kern County. I am married to my estranged, non-debtor spouse, Janie Munger.

Declaration of Kewel K. Munger in Support of     1     R:\Client\11832-002\PLEADINGS\C11 Status
Debtor's First Status Conference Statement           Reports\Decl Kable ISO FIrst Status
                                                     Report.100824.ijq.final.docx

3.      My brother, Baldev (David) Munger, and I are the sons of Lajpat Rai Munger, an immigrant from India who, brought his family to the United States in 1966.  Our father purchased his first farm in 1971, and our family has been farming ever since.  Our father handed off the reins to the family business to David, my older brother, and me in 1988.  Since that time, we have worked tirelessly to grow our business to provide for our families and our descendants, to employ many people, and to buy many goods and services. Today, David and I, and my children are intimately involved in operating the businesses.  For my sake, and to honor my father's legacy, I genuinely hope our family farming business will continue for generations.

4.      David is sixty-seven years old.  He had stepped away from the business and retired; but, due to my health and financial concerns, David recently came out of retirement to take an active role.   David currently oversees the farming activities.   I oversee the processing and marketing facets of the business.  I am engaged in the business on a daily basis and work 75+ hours per week.

**<u>Financial Distress</u>**

5.      A number of powerful factors led to my decision to file for bankruptcy protection. Ultimately, the root causes were: (a) the farming business sustaining significant operating losses in recent years, (b) steeply declining real property values, (c) water concerns, (d) falling commodity prices, (e) high interest rates increasing interest obligations on credit lines with AgWest Farm Credit, our lender; (f) my wife Janie and I withdrawing more than our fair share from the business over the last decade, causing dissention and lender concern, (g) David's resistance to further withdrawals until my wife and I pay him back,  (h) our lenders' expressed concerns over continued owner withdrawals, (i) mounting legal bills due to my divorce, (j) inflation and increased labor costs, (k) SGMA implementation and increased water costs, (l) Ericksson's cancellation of its existing contract, (m) a lack of liquidity in the business, leading to a lack of personal liquidity, and (n) personal health concerns.

6.      My wife and I are personally liable on all of the loans from AgWest Farm Credit as co-borrowers with David and some Munger Entities.  My family has had a beneficial, long-term relationship with AgWest Farm Credit (formerly Farm Credit West) for over thirty years.  I

Declaration of Kewel K. Munger in Support of
Debtor's First Status Conference Statement                     2                     R:\Client\11832-002\PLEADINGS\C11 Status
Reports\Decl Kable ISO FIrst Status
Report.100824.ijq.final.docx

engaged in discussions with AgWest Farm Credit about my financial situation and I continue to discuss solutions with AgWest Farm Credit, including debt reductions. Between my personal assets and my share of the business assets, there should be ample property to pay down the AgWest Farm Credit debt and satisfy creditors. But, my business assets are tied up in the family businesses. I need the protections and structure of the bankruptcy process to facilitate an orderly sale of assets to free up cash to pay down creditors and taxes stemming from the liquidation.

7.     My goal is to utilize the bankruptcy process to: (i) facilitate an orderly sale of assets while generating maximum value for the estate; (ii) liquidate some or all of my business interests and real property, to facilitate repayment to AgWest Farm Credit and reduce the debt-to-income ratio on existing loans so that my family business can continue on. The bankruptcy process will help ensure assets are liquidated in an orderly manner, with full disclosures, marketing efforts, bidding rights, and court oversight, avoiding a 'fire sale' and while maximizing value.

8.     I begin by explaining the entity structure for my business interests. Then, I delve into the business's financial woes in recent years. I continue by explaining how excessive withdrawals by Janie and myself from the business, combined with a liquidity crunch for the business itself, has led to our business loans being distressed. I conclude by explaining how filing for bankruptcy will provide time and breathing room to liquidate non-performing assets (after full marketing, and with court oversight) and free up cash to pay unsecured creditors and taxes.

**<u>Personal Health Distress</u>**

9.     My physicians have diagnosed me with two serious medical conditions. The first deals with my pancreas, where I have a rare condition that requires a major surgical procedure. The other is a preexisting heart condition. Having had multiple heart arteries surgeries to date, my cardiologist has advised me that currently no further surgeries can improve the current artery/heart condition, only a lifestyle improvement of less stress can help me to prolong my life as I live with this unfortunate heart condition.

10.     The stress of recent events is taking a further toll on my physical well-being. I need to resolve my involvement in the business while I can.

///

**The Munger Entities**

11.     I co-own multiple businesses with my brother, David, collectively referred to as the "Munger Entities." David and I are the operators and managers. My interest in these businesses is community property. The Munger Entities are a vertically integrated, diversified agri-business that operate and manage approximately 14,000 acres of land holdings across California, Oregon, and Washington. This includes growing, harvesting, processing, and marketing various agricultural products. Blueberries and pistachios are the two major commodities, which account for more than 75% of the Munger Entities' farming revenues. Robert Hawk is the Chief Executive Officer for the various Munger Entities; he has been in this position for over nine years. Kevin Noell, CPA, is the longtime financial advisor and acting interim Chief Financial Officer of the Munger Entities. The Munger Entities have a full management staff; collectively, the Munger Entities employ over 2,000 people at peak season.

12.     In addition to ownerships through entities, my wife Janie and I also own multiple real properties as community property, which we lease to Munger Entities. David also owns considerable land holdings, which he leases to the Munger Entities. The Munger Entities can be broken down into several categories: (a) farming entities, (b) processing entities, (c) marketing and sales entities, (d) investment entities, (e) the Kailash entities, (f) the Naturipe Entities, (g) the Crowne Entities, (h) the Ireland start-ups, and (i) non-farming (asset holding) entities.

**Farming Entities**

13.     The overarching entity is Munger Bros., LLC ("Munger Bros."), of which David and I are each 50% owners. Munger Bros. is a blueberry, pistachio, olive, and raisin grape farming company. Munger Bros. is the sole owner of several subsidiaries.[1]

14.     Sarbanand Enterprises, LLC is an Oregon-based blueberry, hazelnut, and wine grape farming entity. Sarbanand Farms, LLC is a Washington-based, blueberry farming entity.

///

---

[1] Munger Bros., LLC is the sole member or sole owner of the following entities: Crowne Holding Company, LLC; Munger Exports, Inc.; and Saraband Enterprises, LLC. Munger Bros., LLC is a part-owner (member) of the following entities: Munger Hortifruit NA, LLC (now closed); Naturipe Value Added Foods, LLC; Naturipe RTE, LLC; Naturipe Brands, LLC; and Naturipe Farms, LLC.

15. Occasionally, some of the Munger Entities use 'Munger Farms' or 'Munger Farms, LLC' as a d/b/a designation.[2] David and I each own 50% of Munger Farms.

**Monarch Nut**

16. Monarch Nut Company, LLC ("Monarch Nut") is the only entity in which David owns no interest. Monarch Nut is a pistachio receiving, processing, sales, and marketing company operating on leased land. Monarch Nut leases two sorting machines and has other equipment loans through AgWest Farm Credit. It operates on real property leased from me and my wife. Much of the equipment, buildings, and infrastructure used by Monarch Nut is property of Munger Bros.

**Naturipe Entities**

17. Munger Bros. sells its blueberries under the Naturipe brand. The Naturipe entities, of which Munger Bros. is a part-owner,[3] market fresh berries, ready to eat berries, and frozen products.[4]

**Crowne Entities**

18. The Crowne entities[5] include receive fresh berries, process berries, sell berries to customers, produce dried berry paste, roasted pistachios, processed pistachios, and holds title to certain business equipment.[6]

**Kailash Entities**

19. Kailash Farms, LLC, is a hemp grower, processor, and marketing company.[7] Kailash Wellness, LLC, is a blueberry-based, health and wellness company, conducting research,

---

[2] Munger Farms, LLC ("Munger Farms") is a 'no activity' company, holding the rights to the Munger Farms name.
[3] Munger Bros. owns a 10% share of Naturipe Farms, LLC and Naturipe Brands, LLC. Munger Bros. owns a one-third interest in Naturipe RTE, LLC. Munger Bros. owns a 28.57% interest in Naturipe Value Added Foods, LLC. Munger Bros. and Hortifruit NA, Inc. formed a joint venture, Munger Hortifruit North America, LLC, in 2016; but the entity is only active to manage administrative affairs (no longer grows anything).
[4] There are four Naturipe entities (each a Delaware entity): Naturipe Farms, LLC (marketing fresh blueberries), Naturipe Brands, LLC (holds and manages brand rights for Naturipe entities), Naturipe Value Added Fresh, LLC (ready to each snack company; processing, sales, and marketing; formerly Naturipe RTE, LLC), and (frozen berry sales and marketing company; formerly Naturipe Value Added Foods, LLC Naturipe Foods, LLC).
[5] Crowne Holding Company, LLC; Crowne Cold Storage, LLC; Crowne Frozen Foods, LLC; Crowne Fruit, LLC; and Evergreen Empire, LLC.
[6] Crowne Holding Company, LLC (a holding entity for the other Crowne entities), Crowne Cold Storage, LLC (a fresh blueberry receiver and processor), Crowne Frozen Foods, LLC (a frozen blueberry receiver, processor, and seller), Crowne Fruit, LLC (a natural dried berry paste, pistachio roaster, processor, and seller), and Evergreen Empire, LLC (owns several items of equipment).
[7] MFDI, LLC ("MFDI") (see below) owns 66.67% of Kailash Farms, LLC.

1  product development, sales, and marketing (not currently an active company; operations on hold

2  for last nine months).  Kailash Wellness, LLC is a Nevada entity, of which 50% is owned by

3  MFDI - NV, LLC, (also a Nevada entity).  David and I each own 50% of MFDI - NV, LLC. [8]

4  **Ireland Start-Ups**

5      20.    The Ireland start-up entities include technology and marketing companies[9] which

6  market our products to Irish consumers.[10]

7  **Non-farming, Asset Holding Entities**

8      21.    The asset-holding, investment (non-farming) entities are Four M & Four S

9  Ventures, LLC (a Michigan entity),[11] and two Washington companies, Ocean View Farms, LLC,

10  and Ocean View Estates, LLC,[12] which own real property.

11  **Other Munger Entities**

12      22.    MFDI, LLC is as a diversified investment company.  We utilize Unisource Ag

13  Management, Inc. for managing risk for over-the-road transport for Munger Entities equipment

14  and risks affecting certain domestic and overseas investments.[13]  CRMX-142, Inc. facilitated a

15  reverse tax-deferred real property exchange.[14]  We utilize Munger Exports, Inc. to manage

16  revenue and taxes for exported sales.  Finally, we have closed or otherwise shuttered a few entities

17  over the years.[15]

18      23.    By way of a recap, David and I each own a one-half interest in the following

19  entities: Munger Bros., LLC; MFDI, LLC, MFDI- NV, LLC; Munger Farms, LLC; Munger

20  Investment Group, LLC; Ocean View Estates, LLC; Ocean View Farms, LLC; Sarbanand

21  Enterprises, LLC; Sarbanand Farms, LLC; and Unisource, Inc.  I own the entirety of the

22

23  [8] MFDI – NV, LLC is also sole member of MFDI Ireland Limited (see below).
   [9] MFDI Ireland Limited, of which MFDI – NV, LLC, is the sole member.  MFDI Ireland Limited (holding company)
24  is part-owner of Brightwarter Pharma, Limited and Oleo Technology, Limited.  Brightwater Parhma Limited is a
   parent company, acting as sole owner of Ole Limited and Budtender Limited.  Oleo Technology Limited develops
   and markets proprietary medical dosage monitoring software and hardware products.
25  [10] Oleo Limited and Budtender Limited are for marketing products to Irish consumers.
   [11] MFDI – NV, LLC is part-owner.
26  [12] David and I are each 50% owners,
   [13] David and I each own 50% of these entities.
27  [14] David and I are the two directors and each own 50% of the entity.
   [15] The following entities are either (a) closed, (b) no longer operational, or (c) Mungers withdrew for participation:
28  MPBI, LLC (liquidated in 2021; not listed on California SOS website); New Day Acres, LLC (liquidated in 2021; not
   listed on California SOS website); Munger Investment Group, LLC; and Paramount Nurseries, LLC.

Declaration of Kewel K. Munger in Support of     6     R:\Client\11832-002\PLEADINGS\C11 Status
Debtor's First Status Conference Statement             Reports\Decl Kable ISO FIrst Status
                                                       Report.100824.ijq.final.docx

ownership interest in Monarch Nut, a processing company, with my wife as community property (David does not have any ownership interest in this entity).

24. Monarch Nut, Munger Bros., and the other Munger Entities I own are all pass-through tax entities. The last year for which I filed an individual federal or state income tax return was 2022. Janie's and my joint individual income tax 2023 returns are on extension (will be filed before the upcoming October 2024 deadline).

25. Janie and I individually own our former residence in Bakersfield and several other lots. Our former residence is vacant and to be listed and sold.

**Munger Entities' Financial Distress**

26. The Munger Entities' overall financial picture has taken a turn for the worse over the last five years. In 2019, we had positive net operating income of $2.3 million. In 2020 net operating income was just $1.9 million[16]. In 2021, ignoring legal settlements and asset sales, the Munger Entities *lost* $3.7 million. In 2022, the Munger Entities suffered another operating *loss* of over $11.2 million.[17] Our financial experts anticipate[18] total net operating *losses* for Munger Entities of $15.6 million in 2023. As of today, we expect 2024 operating *losses* to be in the ballpark of $12 million.

27. As explained in further detail below, business losses over the last few years are due to (a) adverse weather conditions (i.e., severe droughts in California), (b) commodity pricing (beyond our control), and (c) steep input cost increases (especially labor, fertilizer, and utilities).

**Oregon and Washington Blueberry Production**

28. A heat dome gripped Oregon and Washington in June 2021, followed by record flooding in Washington in November 2021 (resulting from an atmospheric river) and additional flooding in January 2022. Total production in 2022 was stable in the Pacific Northwest, but, the quality of sellable 'fresh' fruit fell from 65%-85% to between 23% (Oregon) and 45% (Washington) due to unusually high temperatures. In 2023, Oregon blueberry production

---

[16] After backing out capital gains from farmland sales.
[17] Arrived at by taking operating loss of $24.5 million, plus interest, gains, and crop insurance proceeds. Crop insurance proceeds for 2022 were $11.6 million. Munger Bros. lost over $14 million. Sarbanand Farms, LLC had positive income of approximately $918,000. Monarch Nut had positive income of $133,000.
[18] Our 2023 books are currently under third party audit.

increased, but production in Washington fell. Munger Entities was not alone – statewide production for 2023 for all growers in Oregon and Washington fell well below expectations.

*California Blueberry Production*

29. 2023 blueberry production in the San Joaquin Valley was delayed due to cooler, wet weather, which caused later sales, which, unfortunately, coincided with lower prices and lower market demand.[19] Unfortunately, the 2024 San Joaquin Valley blueberry crop came in even lower than the 2023 production levels. In the San Joaquin Valley, production dropped to 8.8 million pounds in 2022, briefly rebounded in 2023, and dropped again to 8.9 million in 2024. In the Stockton region, Blueberry production dipped from 12 million pounds in 2018 to just over 3.1 million pounds in 2022, and approximately 5 million pounds in 2023 and 2024.

*Pistachio Production; Falling Commodity Price*

30. For pistachios, an alternative bearing crop, on-year yields normally averaged around 4,000 pounds per acre, with off-year yields at between 2,000 and 2,500 pounds per acre. In 2022, pistachio production was 40% lower than expected, industry-wide. Our production was just over 4.7 million pounds in 2022, compared with our average of 9.4 million pounds over 2019, 2020, 2021, and 2023.

31. Pistachio prices per pound dropped from $2.75 in 2020 to $1.95 in 2022, and sat around $1.75 in 2023. This affected our revenues and our land valuations. The 'opening grower' price for pistachios in 2024 is $1.50 per pound; and weights are down due to excessive heat during the 2024 growing season.

**Increasing Operating Costs**

32. Our labor costs for blueberries have increased by 30% since 2019, and account for 40%, on average, of our total blueberry costs. Another wage increase in 2024 will further increase costs. This is true for several of the entities.

33. During the pandemic, supply chain costs increased drastically. Labor costs (as noted above) greatly increased post-pandemic. Water costs ballooned in 2022—to around $1,000 to $1,200 per acre-foot ($2,000 per acre foot, fully loaded), as opposed to $400 per acre-foot in

---

[19] Blueberry prices are usually higher early in the season, when supply sits well below market demand.

Declaration of Kewel K. Munger in Support of
Debtor's First Status Conference Statement                     8                     R:\Client\11832-002\PLEADINGS\C11 Status
Reports\Decl Kable ISO FIrst Status
Report.100824.ijq.final.docx

1   2023. Regulatory pressures on groundwater use, largely due to SGMA, is impacting our farming

2   activities

3         34.   Inflation took a large toll in 2023 to present—our interest expense went from $4.3

4   million in 2021 to $6.4 million in 2022 and $9.1 million in 2023.

5   *Net Losses Driven by Falling Operating Income*

6         35.   Operating income for the Munger Entities' farming business started near $2.3

7   million in 2019, fell to around $1.9 million in 2020, then went negative in 2021, with operating

8   losses at $3.7 million. Operating losses grew substantially in 2022, to approximately $11.2

9   million. Once the companies' books are fully audited, operating losses for 2023 are anticipated

10   to be $15.6 million. 2024 operating losses for the Munger Entities are anticipated to be

11   approximately $12 million.

12         36.   Even with crop insurance proceeds at $11.6 million in 2022 and $8.8 million in

13   2023, net income plummeted to *losses* of $10.2 million in 2022 and expected *losses* of $11.8

14   million in 2023.

15   **Fallout from Eriksson Backing out of its Contract with Munger Bros.**

16         37.   David and I entered into a long-term development, marketing, and processing

17   agreement with Eriksson LLC. As part of this agreement, the Munger Bros. agreed to develop and

18   manage approximately 3,500 acres of pistachios for Eriksson. In addition, the 3,500 acres of

19   pistachios would be processed at Monarch Nut until 2042, assuring adequate supply for the

20   processing operation.

21         38.   In September of 2018, Eriksson cancelled the agreement, contending that the

22   Munger Bros. was in breach of the agreement. This matter ultimately was arbitrated by a three-

23   judge panel in Fresno, California. The arbitrators rendered a decision in favor of Munger Bros.,

24   on July 23, 2021. Subsequently, a mediation took place and the case was settled. Munger Bros.

25   is to receive approximately $89 million over a ten-year timeframe (paid out from 2022 through

26   2032). Although the settlement is significant, the Munger Entities continue to sustain significant

27   loss of revenue through 2042, the date the Eriksson contract would have expired. It was anticipated

28   that the Munger Entities would have received an additional $80 million in revenue from this

Declaration of Kewel K. Munger in Support of       9       R:\Client\11832-002\PLEADINGS\C11 Status
Debtor's First Status Conference Statement                       Reports\Decl Kable ISO FIrst Status
                                                              Report.100824.ijq.final.docx

contract had it remained in place until 2042. Thus, the Munger Entities continue to sustain significant operating losses as a result of Eriksson's termination of the agreement. The Munger Entities expanded their processing facility expecting volume from Eriksson, and are now stuck operating a larger facility, at a higher operating cost.

**Distressed Loans from AgWest Farm Credit**

39. Interest rates on loans from AgWest Farm Credit increased from 3% in 2021, to 6.75% in 2022, and up to 8.3% in 2023 remain at this level today. This reality, coupled with increased operating costs and lower revenues led Munger Entities' credit line obligations to jump from $44 million at year-end 2020, to nearly $81 million by the end of 2023. Additional borrowing in 2024 increased our credit line obligations to $104 million as of August 31, 2024. We bumped up against the borrowing limit on the credit lines on or about March or April, 2024. Longer-term debt (including real estate debt) with AgWest Farm Credit sat at $62 million in 2020.

40. Currently, between revolving debt and long-term debt, we owe AgWest Farm Credit approximately $140,000,000.

41. I am personally liable on the AgWest Farm Credit loans, as are my wife and David, as we are co-borrowers. We already very close to the borrowing limits on the AgWest Farm Credit lines of credit. AgWest Farm Credit cooperated with us to refinance our loan portfolio in mid-2023. But, AgWest Farm Credit has made it clear they will not increase our credit lines any further without significant debt reduction. We are at or near the limit on loan-to-value metrics. As commodity prices have fallen, the underlying agricultural land values have fallen in turn. Although as of the Petition Date AgWest Farm Credit had not issued a 'distressed loan' notice, but, my understanding is AgWest Farm Credit was considering issuing such a notice as of the Petition Date.

42. To further demonstrate the cash crunch, Munger Bros. took multiple loans from MFDI. The loan obligation to MFDI stood at $26.4 million as of year-end 2023. Currently, Munger Bros. currently owes MFDI $40.7 million. Separately, my wife and I owe MFDI $3.8 million, which I took personally. Anticipated losses of $12 million for the Munger Entities in 2024 are only compounding our liquidity issues.

**Decline in Land Values**

43.     Since 2020, the value of our land holdings (including land owned by myself and Janie, and land owned by the Munger Entities) has dropped from $305 million to $214 million as of the petition date.   This is primarily due to a drop in commodity pricing and water issues/concerns.

**Personal Withdrawals from Munger Entities**

44.     Cumulatively, Janie and I have withdrawn an estimated $17.5 million more than David from the Munger Entities.  Under the terms of the Munger Entities' governing documents, my wife and I would owe David approximately $8.75 million (to equalize distributions).  David recently served me with a Demand for Arbitration, in part, to resolve the capital account imbalance in Munger Bros. based on over withdrawals by my wife and I.  I do not have $8.75 million in cash or cash equivalents, with which I can repay David.  Cash held by MFDI dropped from just over $24.8 million at year-end 2021.  As of August 31, 2024, MFDI held cash deposits of $1.3 million.

45.     As our CEO, Robert Hawk will attest, Janie habitually called Mr. Hawk and requested distributions from Munger Entities accounts.   And, such distributions were freely granted.  Much of those funds were acquired via loans from AgWest Farm Credit.  This practice came to a stop in 2023.   Munger Bros., LLC ceased member distributions in August 2023; thereafter, distributions to myself or David came from MFDI— but, due to MFDI's declining cash position, distributions from MFDI ended in December, 2023.

46.     As of January 1, 2024, David and I no longer receive draws, we receive guaranteed payments of $650,000 per year (spread equally over twelve months), pursuant to a December 16, 2023 Munger Entities company resolution.  The resolution reflected concerns expressed by David and AgWest Farm Credit over excessive withdrawals by Janie and myself.  The resolution also expressly ended Janie's ability to charge corporate credit cards, since Janie was not working for the Munger Entities.  The resolution did not allay all concerns—early on in 2024, AgWest Farm Credit met with myself, David, Mr. Hawk, expressing concerns over operating liquidity and adherence to working capital requirements in the loan terms.  I met again with AgWest Farm

Credit in August 2024 and am continuing to talk with AgWest Farm Credit about debt reductions and 2025 crop financing.

47. I cannot draw more funds from the Munger Entities to pay personal unsecured creditors—I cannot starve our business of the very funds it needs to pay trade creditors and to stay afloat.

**Dissolution of Marriage Case**

48. I am the Respondent a pending dissolution of marriage action in Kern County Superior Court, cause no. BFL-23-002938, filed by my wife, Janie Munger (the "dissolution case"). To date, the court in the dissolution case has not entered a judgment of dissolution or divided the community estate. There is no trial date yet. My attorneys in the dissolution case are Sandra P. Mendell, of Jaffe Family Law Group and Stacy H. Bowman of Coleman & Horowitt.

49. Janie and I have incurred hundreds of thousands of dollars in attorney's fees in the dissolution matter. I have made multiple efforts to resolve the dissolution case, but Janie has rejected my multiple settlement proposals. Janie "does not believe we have financial stress."

50. On September 6, 2024, in the dissolution case, Janie and I agreed to sell our Eagle Crest residence (the now-vacant marital residence) and to value two other community property real properties (one damaged residence and another plot of vacant land) (No order has been entered). Janie has stymied efforts to retrieve $230,000 held in a safe at the Eagle Crest residence. Janie also deposited (into an account in her name), and kept beyond my reach, insurance proceeds for upwards of $255,384, to be used for repairs on the damaged home on Finchley. On September 6, 2024, Janie and I also agreed to sell a 7.05 carat investment diamond—which, until that time, Janie had refused to sell. My wife has also not accounted for money she received from her cousin meant to repay a loan to us.

51. I need the structure of the bankruptcy process to process asset sales in an orderly manner to reduce debt and propose a Chapter 11 plan.

**Breathing Room**

52. The dissolution of marriage case is just the 'icing on the cake' in terms of our financial struggles. Based on projected business losses for 2024, I cannot foresee the Munger

Entities' liquidity situation improving in the near future.

53. The bankruptcy process affords Janie and me certain benefits not available in our dissolution action. Janie and I are both personally liable on the AgWest Farm Credit debts; we simply have to liquidate assets and pay down debts and the taxes that result from the liquidation.

54. Since Janie filed for divorce, I have lived a relatively modest lifestyle in comparison with Janie. Janie remained in the marital residence until very recently, a nearly 6,800 square foot residence. I am renting a smaller home. I have been paying spousal support to Janie in the amount of $35,000 each month (from the $54,166 I receive each month from Munger Entities).

55. I have attempted to settle the dissolution of marriage case with Janie on several occasions, including two failed mediations.

56. I am currently engaged in discussions with AgWest Farm Credit about downsizing and application of sales proceeds of non-producing assets. I am also actively considering and evaluating whether to make an election under Internal Revenue Code section 1398 (split tax year). I am also seeking an estimate of the estimated tax liability associated with liquidation of assets, which could be in the millions of dollars.

57. Most of my net worth is tied up in entities, which need the land and equipment they own or lease (and which Janie and I lease to them) to keep functioning. The automatic stay will provide me the breathing room I need to identify and liquidate assets in a selective manner, in an above-board process, so we can ensure our business stays operational.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8 day of October, 2024, at Bakersfield, California.

Kewel K. Munger

Declaration of Kewel K. Munger in Support of Debtor's First Status Conference Statement

13

R:\Client\11832-002\PLEADINGS\C11 Status Reports\Decl Kable ISO FIrst Status Report.100824.ijq.final.docx